WM. F. MANZKE, Respondent, v. H. M. GOLDEN-BERG et al., Appellants.

St. Louis Court of Appeals, May 31, 1910.

1. APPELLATE PRACTICE: Theory of Case Below. The court on appeal must dispose of the case on the theory on which it was tried in the court below.

2. CONTRACTS: Waiver of Time for Performance: Should be Pleaded: Pleading. Where, in an action on a contract, defendant pleaded failure of plaintiff to perform within the time fixed, a waiver of the time of performance, to be available, should be pleaded by way of reply.

3. ———: Custom: Requisites. A custom, to constitute a fixed element of a contract, must be certain, settled, and uniform, and known to the parties.

4. SALES: Contracts: Waiver of Time for Performance. A buyer of goods for immediate delivery, who wrote to the seller that he did not wish to press him for a few days for delivery but that the buyer must know definitely how soon the seller could

ship so that the buyer could advise the customer who had brought the goods, etc., thereby waived immediate delivery and permitted delivery within a reasonable time.

5. **INSTRUCTIONS: Refusal: Not Based on Evidence.** Instructions not based on the evidence are properly refused.

6. **CONTRACTS: Breach: Tender of Performance Unnecessary, When.** Where a party to a contract engaged in executing it is notified that the adverse party had repudiated it, he may stop, and, without tendering further performance, sue to recover the contract price for the work performed or goods furnished, and for his damages for the difference between the contract price and what it would have cost to perform the uncompleted contract.

Appeal from Pike Circuit Court.—*Hon. David H. Eby,* Judge.

AFFIRMED.

*Elliott W. Major* and *Emory D. Frazier* for appellants.

(1)    The sale of the eggs in controversy was consummated through a series of telegrams and letters. No time of delivery was mentioned. If there was no custom then the plaintiff would have to deliver the eggs within a reasonable time. Under the undisputed evidence, however there was a universal custom and usage understood by all people engaged in the commission business. No time was stated in the wires or letters selling the eggs, so the respondent was bound to ship same immediately. Joseph v. Andrews Co., 72 Mo. App. 551; Ehrlich v. Ins. Co., 103 Mo. 231; Chemical Co. v. Lackawanna Line, 100 Mo. App. 164. (2)    Even though defendants might have waived the right to rescind for failure on part of plaintiff to ship immediately, yet that waiver, if there was any, could not and does not, as a matter of law, extend further and waive defendant's right to recover damages from the plaintiff for his failure to ship immediately, as he was bound to do under his contract. Wall v. Ice & Cold Storage Co., 112 Mo,

App. 659; Orange Growers' Assn. v. Gorman, 76 Mo. App. 184; Orange Growers' Assn. v. Gorman, 161 Mo. 203.

*W. O. Gray* and *I. C. Dempsey* for respondent.

STATEMENT.—The plaintiff in this case was at the times hereinafter stated a dealer in poultry, butter, eggs and general produce, carrying on business in Bowling Green, Pike county, this State. On the 20th of March, 1907, plaintiff, under his business name of Manzke & Company wrote to the defendants, who were engaged in the same business in Chicago, Illinois, as follows: "We have now on hands three (3) carloads of storage packed eggs. Can you use them? Can you pay the price? It looks like 18 cents to us, boys. Just think this seriously over, drop us wire and it is possible we can do some business." On the morning of the next day, that is the 21st of March, plaintiff wired defendants, "Offer two cars storage eggs eighteen; one car current receipt seventeen half. Answer quick." On the afternoon of the same day defendants wired plaintiff, "Accept your offer two cars storage eighteen, one car current receipt seventeen half, delivered Chicago. Wire when shipping." As interpreted by the testimony in the case these telegrams referred to a quotation of prices on eggs per dozen, the "storage eggs," that is eggs packed, ready for shipment, being quoted at eighteen and the "current receipts," that is eggs not packed and that came in every day to the door of the produce dealer, at 17 1-2 cents per dozen. On the evening of the same day plaintiff applied to the St. Louis & Hannibal R. R. Co., at Bowling Green for cars for immediate shipment and was told the road could not deliver the cars then but would get them as quick as it could, and on the evening of that day, that is the 21st, plaintiff wrote to the defendants quoting the above telegrams and adding, "We will load one car tomorrow of current receipts and the two storage packed

the first of the wreck as it is impossible for us to get cars. We ordered three cars to-day but were informed by the railroad that it would be impossible to get that many this week." The 21st of March, 1907, fell on Thursday. On the 22d of March defendants wrote as follows: · "Please hurry eggs bought from you for shipment as soon as possible. By so doing you will greatly oblige," etc. On receipt of the above letter and on the 23d, defendants wired plaintiff, "Have cars eggs sold. How soon can you ship? Wire answer." Answering this plaintiff wired defendants that day, March 23d, "Impossible to get cars eggs ready; promised two cars to-day," but later that day, two cars were placed at his disposal and loaded and plaintiff wired defendants, "Current receipts loaded to-day, wire, have car storage out Monday. We are doing our best." On that day, March 23d, but obviously before the receipt of the last quoted telegram, defendants wrote plaintiff as follows: "We are in receipt of your telegram stating, 'Impossible to get cars eggs ready, promised two cars to-day.' In reply to same we wired you as follows: 'Have cars of eggs sold. How soon can you ship? Wire answer.' Now, Mr. Manzke, we have on strength of your acceptance sold these eggs and our customer demands delivery of same. *We do not wish to press you for a few days for delivery of same but we must know definitely how soon you can ship so we can advise. our customer.* Awaiting your immediate reply, we remain," etc. The two cars of eggs were apparently loaded on the 25th of March, Saturday, and a bill of lading of that date issued to plaintiff by the St. Louis & Hannibal Railway Company, acknowledging the receipt of 380 cases of eggs consigned to plaintiff under his business name, with the notification under the name of the plaintiff as consignee, "Notify Goldenberg Bros., Chicago, Illinois," and charges marked "Paid," the shipment being routed over the C., B. & Q. Railroad. The routing was done by the St. Louis & Hannibal Railroad Company, the initial carrier. ·

Under date of the 26th of March plaintiff drew a draft on defendants, payable at sight to the order of Peoples' Savings Bank for the price of the consignment which was endorsed on the back, "Hold for arrival," and also endorsed by the Peoples' Savings Bank cashier to the order of the Merchants' Loan & Trust Company or order and under this endorsement was written in lead pencil, "Hold until Monday, 3-29-1907" (so printed in the abstract). On the 27th, Monday, defendants wired plaintiff as follows: "Eggs shipped too late; our customer cancelled order; will protect draft if reduced one hundred seventy-five dollars. Instruct bank accordingly. See letter." Answering this plaintiff on the same day wired defendants, "No time specified as to shipment; you must accept eggs, protect draft." On this same 27th of March, defendants wrote plaintiff to the effect that they had received the draft for the two cars of eggs, quoting the telegram before given, and had received from plaintiff the telegram of that date, the 27th, also before quoted. The letter then proceeds to state: "Of course, we bought the eggs from you for immediate shipment as we certainly do not buy for future delivery. We put our customer off as we informed you previously, as you stated in your telegram of last Saturday that it was impossible to ship eggs as you promised two other cars. We will take your cars for our own account providing you will make us the market price on same which is $4.95 per case f. o. b. Chicago for your currency receipts stock and $5.25 for storage packed eggs. This is an extreme outside price and we do not make one cent on this transaction. We are willing to pay this price providing we continue to do business with you in the new future on larger scales. We will not pay you one cent more for these eggs as we are certainly not to blame that you were unable to make shipment sooner, therefore instruct your bank to accept $175 less the draft calls for and we will protect same promptly. Kindly attend to this at once on receipt of this as we will not hold this offer

open for any length of time. Wire us at once whether you have acted in conformity with our request, and oblige," etc. On that same day and on receipt of the wire quoted above from defendants, and after receipt of the answering telegram, also above quoted, plaintiff wrote to defendants declining to accept the offer and insisting on the draft being paid. This was all the correspondence between the parties and all that transpired between them connected with the contract, there having been no personal meeting between them so far as shown by the evidence. Afterwards plaintiff instituted this action in the circuit court against defendants, claiming $380.12 damages for non-payment of the two cars averred to have been delivered to defendants in the usual and ordinary way of conducting transactions of that kind between country and city produce dealers.

Answering this, the defendants, after a general denial, averring the purchase of the two cars of storage packed eggs and one car of current receipt eggs at the price stated, "all to be shipped and delivered immediately to defendants at the city of Chicago, in the state of Illinois," averred that the plaintiff did not ship and deliver to defendants the cars of eggs as they were bound to do but had failed to carry out the contract and to immediately ship and deliver the eggs to defendants at Chicago, as it is alleged they were bound to do under the contract. Other defenses pleaded are the custom among commission merchants and the general trade in the purchase and sale of eggs and in the offerings and quotations thereon by buyers and sellers, in the absence of any time being mentioned for shipment of eggs bought and sold, the same are to be shipped "immediately," or, that delivery is to be made "within a reasonable time," and that there was neither delivery immediately nor within a reasonable time. It is further set up as an answer that plaintiff is not the real party in interest but that the real party in interest is the Manzke Pro-

duce & Manufacturing Company, a corporation, and that the .purchase was really from them and not from plaintiff and that plaintiff is not entitled to recover. This appears to be abandoned. By way of counterclaim defendants further plead the purchase by them of the three carloads of eggs; that it was for immediate shipment, that it was so understood and that that was the custom among merchants; that plaintiff knew of this custom but did not ship and deliver to defendants the cars of eggs in pursuance of the contract either immediately or in pursuance of the custom above stated or within a reasonable time, whereby plaintiff became liable to defendants for damages sustained, defendants averring that they were ready and willing to comply with their part of the contract but that plaintiff wholly failed to comply with the contract by reason of which failure to comply with the contract and failure to deliver the eggs as contracted defendants had been damaged in the sum of $360. There was a general denial filed to this by way of reply.

At a trial of the case before a court and jury the correspondence above set out was introduced in evidence and evidence also introduced on part of plaintiff tending to show that he had shipped the two cars as soon as it was possible to obtain cars from the St. Louis & Hannibal Railway Company, that company being the only one having a sidetrack or switch into plaintiff's warehouse; had not applied to the Chicago & Alton Railroad Company for cars, as it would have cost ten or twelve dollars per car for drayage to its station. Plaintiff also testified that when defendants refused to honor his draft for the two cars shipped, he had sold them at a loss as stated in the petition. He also testified that the third car was ready for shipment when he received the wire from defendants that they would not take the goods.

One of the defendants testified to the effect that there was a custom or understanding in the trade that

in a sale of this kind, immediate shipment was meant; a witness for defendants testified that delivery "as soon as a man could get them out," was understood. There was no affirmative evidence that plaintiff knew of this custom. There was also evidence on behalf of defendants tending to show that the shipment could have been made by the Chicago & Alton Railroad Company from Bowling Green to Chicago and that plaintiff had made no effort to ship by that road; that the time between Bowling Green and Chicago was shorter by that line than by the C., B. & Q., or the St. Louis & Hannibal. Evidence of defendants also tended to show that when they purchased the eggs from plaintiff they had at once sold to a customer at a profit of thirty cents a case, they having contracted for 1140 cases from plaintiff—380 cases to a car. When the eggs did not arrive the customer bought elsewhere and defendants lost the sale, and also the profit, as the market declined.

Without giving the instructions in full, it is sufficient to say that the court of its own motion instructed the jury that if they found from the evidence in the case that the eggs in controversy were delivered by plaintiff to the defendants in Chicago and that there was no agreement between plaintiff and defendants for an immediate delivery of the eggs and that the eggs were in fact delivered within a reasonable time after the sale and that before such reasonable time, if any, had expired the defendants refused to accept and did not accept said eggs, although the jury may find that said eggs were sold for immediate shipment to defendant, yet if the jury find that thereafter the defendants consented to a delay in said shipment and that the eggs in controversy were in fact within a reasonable time after the sale thereof delivered by plaintiff to defendant in Chicago and that before such reasonable time, if any, had expired the defendant refused to accept and did not accept the eggs in controversy, then the jury should find for the plaintiff on his cause of action.

At the instance of plaintiff the court instructed as to the measure of damage, that is, it was a sum equal to the difference between the contract price of the eggs and the market value of them in Chicago at the time plaintiff was notified by the defendants that they would not receive the eggs at the contract price, not exceeding the amount sued for.

The court also, at the request of plaintiff, instructed the jury that if defendants offered to accept the draft with the deduction of $175 that this was a proposition for a new contract which plaintiff was not bound to accept and does not in any way preclude him from recovering the full amount of damages he sustained by reason of the failure of the defendants to execute their part of the contract, if the jury find there was such a failure.

At the request of the defendants the court instructed the jury, first, that plaintiff's inability to secure cars or the delay in getting cars, if any, in which to ship did not excuse or relieve plaintiff from responding in damages to defendants on their counterclaim, if the jury found defendants had sustained any damage by reason of any delay in the shipment of the eggs; second, that after the sale of the eggs to the defendants it became plaintiff's duty to make every reasonable effort and use due diligence in his effort to secure cars for the shipment of the eggs; third, that under the pleadings in the case the jury has a right to find for plaintiff on his claim and at the same time to find for the defendants on their counterclaim; fourth, if the jury found that plaintiff sold the three cars to defendant to be delivered at Chicago, then it was plaintiff's duty to ship to defendants at Chicago both the two cars of storage eggs and one car of current receipts, "and the defendants were under no obligation to receive anything else." The court, however, added to this instruction the following: "But the defendant would not be authorized in rescinding the contract on the ground of non-delivery of the third car, provided the

full time for the delivery of the three cars had not expired, when defendants refused to accept the eggs." By the fifth instruction the court told the jury that if they found from the evidence that plaintiffs had sold the three cars of eggs mentioned and that plaintiff was delayed in making the shipment of the eggs to defendants by reason of plaintiff's inability to secure cars in which to make the shipment and find. from the evidence that defendants were informed as to the cause of the delay and did not cancel the sale or contract until March 27th, "still, defendants by such acts did not waive their right to recover damages against plaintiff on defendants' counterclaim for whatever damages, if any, they have sustained by reason of the delay, if any, in making said shipment." In the sixth instruction the court told the jury that if they found for defendants on defendants' counterclaim they should so state in their verdict and assess such damages as they found in favor of defendants not exceeding the sum demanded. Two instructions were refused in the nature of a demurrer to the evidence. Among the numerous instructions asked by defendants and refused it is only necessary briefly to notice those on the refusal of which error is assigned by defendants. The first of these is No. 10. The court was asked to instruct the jury as a matter of law that if they found plaintiff failed to ship the eggs "as required by his contract or a general custom in relation to the buying or selling of eggs in the market, the defendants would have a legal right to either accept the eggs or cancel the order and still recover whatever damages, if any, they may have sustained by reason of the delay, if any, in the shipment of said eggs." Another instruction requested (No. 11) was to the effect that it became plaintiff's duty to ship defendants both the two cars of storage packed eggs and the one car of current receipt eggs and if the jury found from the evidence that plaintiff did not ship all three of the cars of eggs to the defendants plaintiff is not entitled to recover. This was

refused by the court on the stated ground that it ignored
the evidence as to the rescission of the contract by de-
fendants before a reasonable time for delivery had ex-
pired. Instructions Nos. 12, 13, 14 and 16 asked were re-
fused for the same omission. Plaintiff excepted to the
refusal of these instructions. Instruction No. 17 need
not be set out as there is no exception saved to its re-
fusal. Nor was there any exceptions saved to the addi-
tion made by the court to the fourth instruction given
at the instance of the defendant.

The jury returned a verdict in favor of plaintiff for
$380 and against defendants on their counterclaim and
judgment went accordingly. Motion for a new trial and
in arrest were filed and overruled, exceptions saved and
appeal duly perfected by defendants.

REYNOLDS, P. J. (after stating the facts).—Con-
sidering the evidence and the instructions given, we have
concluded that the case was correctly presented to the
jury. We must treat this case as it was tried in the
lower court, that is to say on the theory that the waiver
claimed was properly before the court. Correctly and
accurately the waiver of time for the performance of
the contract claimed to have been extended by reason of
the letter of the 23d of March from the defendants to
plaintiff should have been pleaded by way of reply. See
Ehrlich v. Life Ins. Co., 103 Mo. 231, 15 S. W. 530.
This last case is also authority in support of the action
of the trial court in refusing the 10th instruction asked
by the defendant. There was no such proof in the case
of the existence of a general custom as to constitute it a
fixed element of contract; no proof of a custom which
was certain, settled and uniform, and that being so this
particular 10th instruction was properly refused. Nor is
there any pretense of evidence to bring home to plaintiff
a knowledge of any custom. The other instructions were
properly refused, first because each of them sounded on
this matter of custom, and second, for the reasons stated

by the court, that is, they ignored the waiver in the letter of the 23d of March. In point of fact that letter, in so many words, waived immediate delivery and really set-tled this case against defendants, provided the shipment was made within a reasonable time. On the proposition as to the liability of the plaintiff to the defendants for non-delivery of the three cars as originally contracted for, and on which the counterclaim rests, we think that the law which governs and controls this is set out in Berthold v. St. Louis Electric Const. Co., 165 Mo. 280, 65 S. W. 784, where at page 304, our Supreme Court said; "If one party to a contract while engaged in exe-cuting the same is notified by the other party that he has annulled and repudiated the contract and will not longer abide by it, the first party may stop, and without tendering . . . further performance of the contract, bring his action to recover the contract price for the work performed or goods furnished, and for his damages for the difference between the contract price and what it would have cost to perform the uncompleted part. [Black River Lumber Company v. Warner, 93 Mo. 374, 6 S. W. 210; Gabriel v. Brick Co., 57 Mo. App. 520; Chapman v. Railroad, 146 Mo. 493-4, 48 S. W. 646.]"

In the case at bar plaintiff has not chosen to sue for damages alleged to have been sustained from loss of profits on all the three cars but merely for his loss on the two cars which he shipped.

Our conclusion upon the whole case is that it was correctly tried and that the verdict and judgment are for the right party. The judgment of the circuit court is accordingly affirmed. All concur.